UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RYAN SMITH,
          Plaintiff,
   vs.                                              **COMPLAINT**

COUNTY OF CHAUTAUQUA and
CHAUTAUQUA COUNTY DEPUTY SHERIFF LIAM THOMPSON
          Defendants.

_____

## Jury Demand

Trial by Jury on all issues is demanded.

## Preliminary Introduction

Plaintiff Ryan Smith brings this combined federal civil rights and state law action arising from the investigation and prosecution initiated against him in 2025 for alleged animal cruelty relating to the purported failure to provide adequate shelter for a horse located on Plaintiff's property in the Town of Hanover, County of Chautauqua, State of New York. At all relevant times, Plaintiff and his family provided care, food, water, and shelter for the horse and were actively completing improvements to a permanent shelter structure while cooperating with responding deputies regarding the condition of the property.

Plaintiff asserts these claims pursuant to 42 U.S.C. § 1983 for violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, as well as related claims under the laws of the State of New York, including but not limited to false arrest and false imprisonment, and abuse of process.

Despite multiple observations by responding deputies that the horse appeared healthy, had access to food and water, and that the shelter situation was sufficient, Defendants caused Plaintiff to be subjected to criminal process without probable cause. Upon information and belief, Defendants

acted not upon an objectively reasonable belief that Plaintiff committed animal cruelty, but in response to repeated third-party complaints and public pressure concerning the matter. Plaintiff was thereafter compelled to submit to booking procedures and suffered public humiliation and reputational harm as a result of Defendants' actions and the resulting media publicity. The criminal matter was thereafter resolved in Hanover Town Court at the arraignment by way of a six-month Adjournment in Contemplation of Dismissal ("ACD") on November 19, 2025, which has since expired and resulted in dismissal of the charge.

As a direct and proximate result of Defendants' conduct, Plaintiff suffered violations of his constitutional and statutory rights, emotional distress, reputational injury, financial loss, and other damages. Plaintiff therefore seeks compensatory damages, punitive damages where appropriate, attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems just and proper

**Parties**

1.      Plaintiff, Ryan Smith, resides at all times here relevant in the Village of Silver Creek, Town of Hanover, Chautauqua County, and State of New York.

2.      Specifically, Plaintiff Ryan Smith resided at 12040 Angell Road, Silver Creek, New York 14136, as of October 23, 2025, the date that gives rise to the causes of action as set forth in this complaint.

3.      Upon information and belief, Chautauqua County, is a municipal corporation duly organized and existing under and pursuant to the laws of the State of New York. At all times relevant hereto, Chautauqua County was responsible for the policy, practice, supervision, implementation, and conduct of all Chautauqua County Sheriff's Office matters and was responsible for appointment, training, supervision, discipline and retention and conduct of all Chautauqua County Sheriff's Office personnel. In addition, at all times here relevant, Defendant County was responsible for enforcing rules of the Chautauqua County Sheriff's Office and also ensuring that the Chautauqua County Sheriff's Office personnel obey the laws of the United States and the State of New York.

2

4.     Upon information and belief, Deputy Liam Thompson, is employed by the Chautauqua County Sheriff's Office and was acting in such capacity during the events that give rise to this lawsuit.

## Jurisdiction

5.     Plaintiff brings this action to recover damages for the violations of his civil rights under the First and Fourth Amendments of the United States Constitution, codified at 42 U.S.C. § 1983 and as bestowed upon the states and its citizens through the Due Process Clause by the Fourteenth Amendment of the United States Constitution.

6.     The Fourth Amendment protects citizens from unlawful searches and seizures.

7.     Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1332 (federal question) and § 1343 (civil rights).

8.     Declaratory, injunctive, and equitable relief is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

9.     Compensatory and Punitive damages are sought pursuant to 42 U.S.C. § 1983, including but not limited to Plaintiff' lost wages, loss of consortium, and the loss of Plaintiff's liberty and freedom pursuant to the illegal and unlawful conduct of the Defendants.

10.     Costs and Attorney's fees may be awarded pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. Rule 54.

11.     At all times here mentioned, Defendants were acting under the color of state law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## Venue

12.     This action properly lies in the Western District of New York, pursuant to 28 U.S.C. § 1343(3) because the claims arose in this judicial district and the Defendants reside in and/or do business in Chautauqua County.

**Factual Background**

13.    On or about September 26, 2023, Plaintiff Ryan Smith and his family adopted a horse named "Kansas," a Tennessee Walking Cross approximately twenty-four years of age, from Happy Tails Farm & Rescue Center, operated by Traci Paszek.

14.    Ownership paperwork for Kansas is maintained in the name of Plaintiff's wife, Amanda Smith, and the horse is also largely cared for by Plaintiff's daughter, Ceili Smith.

15.    Amanda Smith had previously volunteered with Happy Tails Rescue, and through that involvement the Smith family became closely familiar with Kansas prior to the adoption.

16.    After Kansas was adopted, he was immediately boarded at DC Stables, located at 11393 Center Road, Sheridan, New York. Upon information and belief, that facility is owned by Don Cotton and managed by Stacey Herr.

17.    Kansas was boarded pursuant to a self-care boarding arrangement. Under the parties' agreement, Plaintiff and his family were responsible for cleaning Kansas's stall and providing his grain, while the facility was responsible for supplying hay. As new horse owners, Plaintiff and his family relied heavily on Stacey Herr's experience and representations regarding Kansas's care and nutritional needs.

18.    During the boarding period, Plaintiff and his family became concerned that Kansas was not receiving adequate nutrition. They were frequently advised by Stacey Herr that Kansas was large enough and did not require additional grain. Plaintiff and his family nevertheless supplied grain pursuant to the self-care arrangement. They also observed that hay, which was the responsibility of the facility to provide, was often depleted or unavailable when they visited. In addition, the hay that was provided was frequently of poor quality, containing excessive twigs and other undesirable material. Plaintiff and his family further observed that the facility commonly relied upon a single round bale to feed approximately five horses for extended periods of time, which they believed was

insufficient to meet Kansas's nutritional needs. Over time, Plaintiff and his family observed that Kansas appeared to be losing a substantial amount of weight.

19.    On or about September 27, 2024, Plaintiff arranged for veterinarian Katie Ball to examine Kansas and conduct a wellness visit. During that examination, Dr. Ball advised Plaintiff that Kansas was significantly underweight. Although Stacey Herr had previously suggested that Kansas required dental floating, Dr. Ball determined that Kansas's weight loss was not attributable to dental issues, noting that he was not exhibiting signs typically associated with such problems. Instead, Dr. Ball concluded that Kansas's weight loss was caused by inadequate hay and grain intake and further opined that competition and bullying from other horses in the pasture may have limited his access to available feed.

20.    Following the veterinarian's recommendations, Plaintiff attempted to stall Kansas to better monitor his hay consumption. However, Kansas routinely escaped from the stall and sought to remain outdoors.

21.    As a result of continuing disagreements regarding Kansas's care following the September 2024 veterinary examination, Plaintiff ultimately decided to relocate him to a different boarding facility.

22.    On or about December 31, 2024, Kansas was moved to Northern Lights Equine Rescue, located at 11765 Old Main Road, Silver Creek, New York. Following the move, Kansas exhibited improved behavior and condition. Plaintiff observed that Kansas benefited from continuous outdoor access, separation from horses that had previously limited his access to feed, and a feeding program that provided him with consistent access to quality hay.

23.    Photographs depicting Kansas's physical condition while boarded at DC Stables are attached collectively as *Exhibit A*. The photographs were taken by Plaintiff's wife on September 28, 2024, at DC Stables and fairly and accurately depict Kansas's appearance and body condition at that time.

24.    Kansas remained at Northern Lights Equine Rescue until May 31, 2025, while Plaintiff completed fencing and shelter improvements at his property located at 12040 Angell Road, Silver Creek, New York. After the fencing was installed and a barn structure had been erected, Plaintiff and his family decided to bring Kansas home.

25.    At the time Kansas returned to the property, the barn structure did not yet have a finished roof. However, an overhead sail-shade covering had been installed to provide shelter, and Plaintiff was continuing work to complete the permanent roof.

26.    Plaintiff also maintained an additional shelter area for Kansas within the shop/garage building adjacent to the residence. Photographs of that shelter area taken by Cattaraugus County Legislator and Cattaraugus County SPCA Farm Animal Welfare Officer Ginger Schroeder on November 4, 2025, are attached collectively as *Exhibit B* and fairly and accurately depict the condition and appearance of the shelter area on that date. Simply put, the horse did have shelter sufficient from the elements and such fact was brought to the attention of the Defendants in this case.

27.    According to Traci Paszek, before Kansas was adopted by the Smith family, he had been returned to Happy Tails Farm & Rescue Center on multiple occasions due to behavioral issues and difficulty adapting to traditional boarding and shelter environments.

28.    Ms. Paszek further advised that Kansas was known to resist remaining indoors, including kicking stall doors and overturning objects in attempts to get outside. As a result, while at Happy Tails Rescue, Kansas was provided with unrestricted indoor and outdoor access so that he could remain outdoors when he wanted to. In short, Kansas preferred to be outdoors, as is the case with many horses.

29.    Beginning in or about July 2025, the Chautauqua County Sheriff's Office began receiving complaints regarding the condition of Kansas and the adequacy of the shelter located on Plaintiff's property.

30.    On or about July 7, 2025, Deputy M. White of the Chautauqua County Sheriff's Office followed up on a complaint regarding Kansas. Plaintiff advised Deputy White that

construction of the barn roof was ongoing and would be completed soon which satisfied Deputy White's inquiry. During the interaction, Deputy White also said that he had walked up to the barn and personally observed Kansas, observing that the horse had hay, grain, and water available, noted that the water remained cold, and remarked that the horse appeared healthy and happy.

31.    On or about August 11, 2025, another complaint was made concerning Kansas. Deputy R. Brown thereafter contacted Plaintiff regarding the complaint, and Plaintiff again advised that work on the barn was ongoing and that contractors were expected to work on the roof near the end of August 2025. Plaintiff further explained that Kansas frequently chose to remain outdoors even though shelter options were available. In fact, Kansas commonly burrowed into hay bedding rather than entering covered areas and would often remain outside during winter weather. As evidence of this behavior, attached as *Exhibit C* are photographs taken by Plaintiff and Plaintiff's wife depicting Kansas outdoors in snowy conditions at Northern Lights Equine Rescue on January 14, 2025, January 21, 2025, and December 14, 2025; as well as outdoors on Plaintiff's property lying in hay bedding on October 11, 2025. These photographs are offered to fairly and accurately depict Kansas's customary preference for remaining outdoors despite the availability of shelter. Even so, Deputy Brown acknowledged that Plaintiff had installed plywood as a temporary measure while construction of the barn was underway to provide Kansas with comfort and protection in the field during ongoing barn construction.

32.    On or about August 28, 2025, another complaint was made to the Chautauqua County Sheriff's Office regarding Kansas. Deputy Liam Thompson thereafter contacted Amanda Smith, who reiterated that contractors were expected to be installing the roof that weekend.

33.    On or about September 10, 2025, Deputy Thompson again followed up at the property and personally observed that rafters had been installed and that the shelter situation appeared to be actively progressing toward completion, as shown in *Exhibit D*.

34.    Despite the foregoing, on or about October 22, 2025, the Chautauqua County Sheriff's Office received an additional complaint alleging that Kansas lacked adequate shelter.

35. Upon information and belief, the Defendants, without probable cause, determined that the shelter was inadequate, notwithstanding prior observations indicating that Kansas appeared healthy, had access to food and water, had both enclosed and temporary field shelter available, and that construction of the barn was ongoing and provided shelter for the horse.

36. Upon information and belief, in the period leading up to the incident described herein, Stacey Herr repeatedly contacted Traci Paszek regarding Kansas and urged her to remove the horse from Plaintiff's property based on allegations that Kansas remained outside year-round without adequate shelter and was suffering from rain rot. Ms. Paszek was further informed by Ms. Herr that she had filed complaints regarding Kansas with both the SPCA and the Chautauqua County Sheriff's Office.

37. In addition to these contacts, Ms. Paszek received multiple anonymous phone calls making substantially similar complaints concerning Plaintiff and Kansas.

38. Ms. Paszek was subjected to repeated external complaints and pressure regarding the situation. As a result and in an effort to de-escalate the matter while it was being reviewed, Ms. Paszek arranged for a third party to retrieve Kansas from Plaintiff's property.

39. According to Ms. Paszek, as a professional who routinely handles animal welfare and abuse matters in the course of her work, she did not believe Kansas was the victim of animal cruelty or neglect. She further advised the responding deputies that Kansas appeared healthy and in good condition at the time he was removed from Plaintiff's property, as evidenced in the police report attached in *Exhibit E.*

40. Ms. Paszek also acknowledged that Plaintiff and his family continued to consistently care for the horse while he was back at Happy Tails Farm & Rescue Center.

41. On or about October 23, 2025, Plaintiff was issued an appearance ticket by Deputy Thompson charging him with animal cruelty relating to the alleged failure to provide adequate shelter for Kansas.

42.    Upon information and belief, Deputy Thompson indicated to Plaintiff, that he did not wish to issue the appearance ticket, but was directed to do so by his supervisor due to the volume of complaints being received and the public pressure exerted upon the Sheriff's Office. In other words, the charge was filed on account of public pressure as opposed to probable cause.

43.    Thereafter, on or about a week later after issuing the appearance ticket, Deputy Thompson returned to Plaintiff's property to provide additional paperwork directing Plaintiff to report to the Chautauqua County Sheriff's Office for fingerprinting and booking procedures.

44.    By this point, allegations concerning Plaintiff had already begun circulating publicly through media coverage stemming from a press release issued by the Chautauqua County Sheriff's Office, attached hereto as *Exhibit F*. The allegations were subsequently circulated on social media platforms, causing Plaintiff and his family substantial embarrassment, humiliation, and reputational harm within their community. Plaintiff raised this concern with Deputy Thompson, who stated, in substance, that he did not wish to issue the press release but was directed to do so by his supervisor, again due to public criticism of the Sheriff's Office's handling of the matter.

45.    Thereafter, Ms. Paszek and Happy Tails Rescue were subjected to additional harassment relating to Kansas, including anonymous communications warning that the rescue organization would suffer consequences if Kansas was returned to Plaintiff and his family. A copy of an anonymous letter sent to Ms. Paszek on or about October 25, 2025, is attached as *Exhibit G*. As a result of the continuing controversy and concerns regarding interference directed at Ms. Paszek, Happy Tails Farm & Rescue Center, and Plaintiff and his family, Plaintiff ultimately arranged for Kansas to be boarded back at Northern Lights Equine Rescue, in part to address those concerns.

46.    Upon information and belief, individuals associated with Stacey Herr publicly shared and circulated the media reports and allegations concerning Plaintiff, as demonstrated in *Exhibit H.* Plaintiff further became aware of incidents occurring while Kansas was being boarded at Northern Lights Equine Rescue in which unknown individuals approached or interfered with Kansas' enclosure area, causing additional concern for the safety and well-being of the horse.

47.     On or about November 4, 2025, Ginger Schroeder, a Cattaraugus County Legislator and the Farm Animal Welfare Officer for the Cattaraugus County SPCA, personally inspected Kansas and Plaintiff's property.

48.     During her inspection, Ms. Schroeder conducted a Henneke Body Condition Score ("BCS") assessment of Kansas. The Henneke BCS is a standardized scoring system used to evaluate the fat cover and overall physical condition of horses on a scale from 1 (emaciated) to 9 (obese), with scores between approximately 4 and 6 generally considered healthy and appropriate. Ms. Schroeder assessed Kansas as a 4.5 on the Henneke scale, indicating that the horse was within a healthy and acceptable body condition range at the time of the inspection. These findings were reported to Plaintiff's counsel as shown in ***Exhibit I.***

49.     Ms. Schroeder further provided Plaintiff's counsel with an example from a separate animal welfare matter for contextual comparison, in which a horse that had been surrendered immediately prior to seizure for neglect was assessed at approximately 1.5 on the Henneke scale due to severe emaciation. According to Ms. Schroeder, after several months of rehabilitation and nutritional support at a rescue facility, that horse improved to approximately a 4.5 on the Henneke scale, the same score assigned to Kansas during her inspection. See ***Exhibit J.***

50.     During the November 4, 2025 inspection, Ms. Schroeder also photographed Kansas and the surrounding property conditions. True and correct copies of those photographs are attached hereto as ***Exhibits B, D, I, and K.***

51.     On or about November 19, 2025, Plaintiff appeared before the Hanover Town Court in connection with the animal cruelty charge. The matter was resolved by way of a six-month Adjournment in Contemplation of Dismissal ("ACD"). The adjournment period has since expired, and the charge has been dismissed.

52.     At all relevant times, Kansas remained healthy, adequately fed, and properly cared for. Plaintiff and his family continuously worked toward completion of the barn structure and cooperated with all requests and communications from law enforcement. Despite this, Defendants

caused Plaintiff to be subjected to criminal process, booking procedures, public humiliation, and reputational harm without probable cause and for reasons unrelated to legitimate law enforcement objectives.

53.    As a result of the foregoing events, Plaintiff suffered substantial financial losses and incurred significant legal expenses. Plaintiff also experienced disruption to business operations and severe emotional distress. The mischaracterization of Plaintiff as an animal abuser and the violation and deprivation of Plaintiff's civil rights as guaranteed under both the New York State Constitution and the United States Constitution, directly contributed to this emotional distress. Upon information and belief, the injuries and damages sustained by Plaintiff were caused by the negligence, carelessness, reckless disregard, and/or unlawful conduct of the agents, servants, and/or employees of the Defendants.

**First Cause of Action for violations of the Fourth and Fourteenth Amendment as per 42 U.S.C. § 1983 for unreasonable seizure, false arrest, and false imprisonment against DEFENDANT CHAUTAUQUA COUNTY DEPUTY SHERIFF LIAM THOMPSON, in his Official and Individual Capacities:**

54.    Plaintiff Ryan Smith repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

55.    Plaintiff asserts that he was unlawfully seized, arrested, and subjected to false imprisonment by Defendant Deputy Thompson on or about October 23, 2025, when Defendant caused Plaintiff to be charged and issued an appearance ticket for animal cruelty without probable cause that a crime had been committed.

56.    The Fourth Amendment prohibits the police from carrying out unreasonable seizures. An arrest is a "seizure" under the Fourth Amendment.  Under the Fourth Amendment, an arrest may only be made when a police officer has probable cause to believe that the person arrested has engaged in criminal conduct.  An arrest without probable cause is an unreasonable seizure.

11

57.    In New York, any § 1983–based false arrest claims are "distinguished from their state law analogues only by the requirement that the tortfeasor act 'under color of state law.' " Hickey v. City of New York, No. 01 Civ. 6506, 2004 WL 2724079, at *6 (S.D.N.Y. Nov.29, 2004) (citing Post v. Doherty, 944 F.2d 91, 94 (2d Cir.1991)). Therefore, this Court must look to the New York State law of false arrest, recognizing that in New York, claims of false arrest are synonymous with those of false imprisonment. Williams v. City of Mount Vernon, 428 F. Supp. 2d 146, 157 (S.D.N.Y. 2006).

58.    To establish a claim for false arrest, plaintiff must prove:

      a.  defendant intended to confine plaintiff;

      b.  plaintiff was conscious of the confinement;

      c.  plaintiff did not consent to the confinement; and

      d.  the confinement was not otherwise privileged.

59.    An individual can be said to have been seized by the police only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. (citations and interior quotation marks omitted); see Brown v. Sweeney, 526 F. Supp.2d 126, 132 (D. Mass. 2007).

60.    Factors which might suggest a seizure therefore include: the threatening presence of several officers; the assertion of authority; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory.

61.    In the case at hand, Defendant Deputy Thomspon was acting under color of state law, as he was on duty as a Chautauqua County Deputy Sheriff during the events described herein and sworn to uphold and enforce the laws of the State of New York.

62.    Defendant intended to confine Plaintiff by initiating criminal process against him and issuing an appearance ticket for animal cruelty, thereby compelling Plaintiff to submit to the authority of the criminal court, restricting his liberty, and subjecting him to the continuing control and supervision of the State. Plaintiff was conscious of this confinement, as he was required to appear in court, defend against criminal charges, and live under the ongoing threat of arrest and prosecution.

63.     Plaintiff did not consent to said confinement, seizure, or arrest. Any compliance by Plaintiff was compelled by Defendant's assertion of legal authority and the threat of further criminal penalties for failure to comply. Said confinement was not otherwise privileged, as Defendant lacked probable cause to believe that Plaintiff had committed any criminal offense.

64.     Although Plaintiff was not handcuffed or physically jailed at the time the appearance ticket was issued, the issuance of the appearance ticket constituted an arrest and seizure under New York and federal law, as Plaintiff's liberty was restrained and he was not free to disregard the charges or decline to appear in court.

65.     At all times, Defendant Deputy Thompson lacked probable cause to arrest or seize Plaintiff. Defendant was aware, or should have been aware, that Plaintiff and his family had continuously provided care for Kansas, including food, water, shelter, and ongoing maintenance of the horse's living conditions, and were actively completing shelter improvements at the property. Defendant further knew that Kansas appeared healthy during his interactions and observations, that Plaintiff had been cooperative throughout the investigation, and that law enforcement had been advised of the ongoing construction efforts to the barn roof and anticipated completion timeline.

66.     Notwithstanding these facts, Defendant caused Plaintiff to be charged with animal cruelty, resulting in Plaintiff's unlawful seizure, arrest, and false imprisonment. The absence of probable cause was later confirmed when all criminal charges against Plaintiff were dismissed, albeit on a delayed basis, by the Town of Hanover Court on November 19, 2025 and then dismissed by operation of law on May 19, 2026.

67.     At all times, the unlawful, wrongful, and false arrest of Plaintiff was without basis and without probable cause or reasonable suspicion, and resulted in a violation of Plaintiff's civil liberties.

68.     Such conduct, in conjunction with all facts alleged herein this complaint, constitutes that Defendant Deputy Thompson caused, in whole or in part, Plaintiff to be unreasonably seized and falsely arrested as defined by law.

69.     Defendant had no legal basis to seize or arrest Plaintiff, nor was there a warrant authorizing Defendant to do so, thus making such seizure unlawful.

70.    Such deprivations of Plaintiff's property rights and right to liberty and happiness were in violation of the rights secured to Plaintiff by the Fourth and Fourteenth Amendments of the United States Constitution and by Title 42 U.S.C. § 1983.

71.    As a result of Defendant's deprivation of Plaintiff's civil and constitutional rights, Plaintiff has suffered emotional distress, humiliation, mental anguish, financial loss, legal expenses, and disruption to his personal and professional life, all in an amount to be determined at trial.

72.    Plaintiffs demand costs and attorney fees pursuant to 42 U.S.C. § 1988.

**Second Cause of Action for the Abuse of Process Against Defendants COUNTY OF CHAUTAUQUA AND CHAUTAUQUA COUNTY DEPUTY SHERIFF LIAM THOMPSON, in their Official and Individual capacities.**

73.    Plaintiff, Ryan Smith, repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

74.    Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective (Board of Education v. Farmingdale Classroom Teachers Asso., 38 N.Y.2d 397, 399, 380 N.Y.S.2d 635, 638, 343 N.E.2d 278, 280 (1975)).

75.    Here, the "process" at issue includes, but is not limited to, the issuance of the criminal appearance ticket charging Plaintiff with animal cruelty, the compulsory booking and fingerprinting procedures imposed upon Plaintiff, and the associated criminal process initiated through the Hanover Town Court.

76.    At all relevant times, Defendant Deputy Thompson possessed substantial information demonstrating that Kansas was healthy, adequately cared for, and not the victim of neglect or abuse. Multiple responding deputies personally observed that Kansas had hay, grain, water, and shelter available, appeared healthy, and that Plaintiff was actively engaged in ongoing barn construction efforts. Defendants further knew that Kansas had behavioral tendencies causing him to prefer remaining outdoors even when shelter was available.

14

77.    Additionally, immediately following issuance of the appearance ticket, Traci Paszek, the operator of Happy Tails Farm & Rescue Center and an experienced animal welfare professional, expressly advised Deputy Thompson that the horse appeared healthy and in good condition.

78.    Further, on or about November 4, 2025, Ginger Schroeder, a Cattaraugus County Legislator and Farm Animal Welfare Officer for the Cattaraugus County SPCA, personally inspected Kansas and assessed the horse at a 4.5 on the Henneke Body Condition Score scale, a score recognized as within a healthy and acceptable condition range for horses. Ms. Schroeder's observations and photographs further confirmed that Kansas was not emaciated, neglected, or suffering from abuse.

79.    Despite the foregoing, Defendant Deputy Thompson caused criminal process to be issued against Plaintiff. Upon information and belief, Defendant Deputy Thompson lacked probable cause to pursue criminal charges and knew or should have known that the available evidence did not support allegations of animal cruelty.

80.    Upon information and belief, Defendant's actions were motivated not by legitimate law enforcement objectives, but by improper collateral purposes unrelated to the lawful prosecution of criminal conduct. Specifically, Deputy Thompson advised Plaintiff, in substance, that he did not wish to issue the appearance ticket or related press release, but was directed to do so by supervisory personnel due to mounting public criticism, repeated complaints being made to the Sheriff's Office, and pressure that law enforcement was not taking sufficient action regarding Kansas.

81.    Upon information and belief, Defendant Deputy Thompson utilized criminal process as a means to placate public criticism, respond to political and community pressure, and create the appearance of enforcement action in response to persistent complaints and public scrutiny surrounding the matter.

82.    Moreover, Defendant Deputy Thompson caused or permitted the issuance of a public press release concerning the allegations against Plaintiff despite substantial information undermining the existence of criminal neglect or abuse. The resulting media coverage and social media circulation subjected Plaintiff and his family to humiliation, reputational damage, harassment, and public ridicule within their community.

83.    The criminal process initiated against Plaintiff was therefore used in a perverted manner to achieve collateral objectives wholly outside the legitimate scope of criminal prosecution, including appeasing complainants, shielding the Sheriff's Office from criticism regarding its handling of complaints, and generating public perception that enforcement action had been taken regardless of the actual merits of the allegations.

84.    Defendant Deputy Thompson's conduct constituted an improper and malicious misuse of criminal process for purposes unrelated to the fair and impartial enforcement of the law.

85.    Defendant COUNTY OF CHAUTAUQUA is liable for the tortious acts of its employees, agents, and servants, including Defendant Deputy Liam Thompson, under the doctrine of respondeat superior, as such acts occurred within the scope of his employment and official duties.

86.    As a direct and proximate result of Defendants' abuse of process, Plaintiff suffered damages including, but not limited to, legal expenses, emotional distress, humiliation, reputational harm, interference with business operations, loss of enjoyment of life, and other economic and non-economic damages in an amount to be determined at trial.

87.    Defendants' conduct was intentional, malicious, willful, reckless, and in conscious disregard of Plaintiff's constitutional and common-law rights, thereby entitling Plaintiff to compensatory damages, punitive damages, costs, disbursements, and such other and further relief as this Court deems just and proper.

**Punitive Damages against CHAUTAUQUA COUNTY DEPUTY SHERIFF LIAM THOMPSON his Individual Capacity:**

88.    Plaintiff Ryan Smith incorporates by reference all of the allegations set forth herein in this Complaint as if fully set forth herein.

89.    Defendant CHAUTAUQUA COUNTY DEPUTY SHERIFF LIAM THOMPSON's individual capacities were deliberately indifferent to Plaintiff's Constitutional rights, and, exhibited such indifference and malice by their above-referenced actions throughout this horrific ordeal as sustained by Plaintiff.

16

90.    Punitive damages are justified against the above-stated Defendant for their deliberate indifference and malice towards the Plaintiff herein.

91.    As a direct and proximate result of the acts of Defendant Deputy Thompson, Plaintiff suffered the following injuries and damages:

    a.  Violation of his right pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of his person and of his property.

    b.  Violation of his rights pursuant to the Fourteenth Amendment of the United States Constitution to due process.

    c.  Emotional trauma and suffering, including fear, embarrassment, humiliation, harassment, emotional distress, frustration, extreme inconvenience and anxiety.

    d.  Compensatory damages in the form of lost wages and lost income, attorney fees, and other damages to be set forth over the course of this proceeding.

**WHEREFORE**, Plaintiff demand judgment on the above counts against the Defendants, their units, their officers, employees, against and other persons acting in concert or participation with them as stated above, and award the following amounts:

    a.  Compensatory damages in favor of the Plaintiff in an amount to be determined by a jury;

    b.  Exemplary damages in favor of the Plaintiff;

    c.  Costs of this action, including reasonable attorney fees to the Plaintiff Pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, U.S.C. 1988 (1976); and,

    d.  Punitive damages as stated above;

    e.  Such other relief as the court may deem appropriate.

DATED:        July 1, 2026
              Darien Center, New York


                                        /s/ Matthew Albert, Esq.
                                        The Law Offices of Matthew Albert Esq.
                                        2166 Church Rd.
                                        Darien Center, New York 14040
                                        mattalbertlaw@gmail.com
                                        Office: (716) 445-4119
                                        Fax: (716) 608-1388

18